**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

v.

JAVON LEWIS

Crim. No. 1:06-cr-00076-NLH-1

**OPINION**

**APPEARANCES:**

ANDREW D'AVERSA
OFFICE OF THE US ATTORNEY
970 BROAD STREET, 4TH FLOOR
NEWARK, NJ 07102

DIANA V. CARRIG
OFFICE OF THE US ATTORNEY
US POST OFFICE BUILDING
401 MARKET STREET, 4TH FLOOR
CAMDEN, NJ 08101

*Attorneys for United States of America*

JULIE A. MCGRAIN
FEDERAL PUBLIC DEFENDER'S OFFICE
800 - 840 COOPER STREET, SUITE 350
CAMDEN, NJ 08102

*Attorney for Javon Lewis*

**HILLMAN, District Judge**

Before the Court is Javon Lewis' ("Lewis" or "Defendant") Motion for Reduction of Sentence under § 404(b) of the First Step Act and Supplemental Motion for Reduction of Sentence. (ECF 406, 412). For the reasons that follow, the Motions will be denied.

## I. **Background**

On March 7, 2008, Defendant was found guilty by a jury of Count One: Conspiracy to Distribute and Possession with Intent to Distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base in violation of 21 U.S.C. § 846 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)); Count Two: Murder in Furtherance of a Drug Trafficking Conspiracy in violation of 21 U.S.C. § 848(e)(1)(A); and Count Three: Murder in the Course of a Firearms Offense in violation of 18 U.S.C. §§ 924(c)(1) and 924(j). (ECF 282).

The jury verdict and the uncontested findings of the Presentence Investigation Report with Second Addendum ("PSR")(ECF 484) established that Defendant:

> . . . headed a long-term, large-scale drug trafficking organization in Camden [New Jersey](hereafter referred to as "the Jevon Lewis Organization"). From approximately early 2001 to September 2002, the Jevon Lewis Organization purchased well over 150 kilograms of cocaine from Ray Morales. The Jevon Lewis Organization operated several open air drug markets in Camden, including one located at 8th and Central Streets. Evidence presented at trial established that Jevon Lewis's drug set at 8th and Central sold crack cocaine. . . . A number of people worked for Jevon Lewis in his organization, including Ahmed Judge . . . [Judge], although also a low-level drug dealer, was primarily an "enforcer" for [] Lewis.

(Id. at ¶¶ 44, 45).

The Lewis Drug Trafficking Organization obtained its drugs from the Ray Morales Organization and worked hand in glove to serve Morales's goals to:

> . . . (a) maintain his long-term relationships with his two main sources of cocaine--one in Arizona and the other in New York-- to ensure a steady supply of high quality cocaine at relatively low prices; (b) maintain the loyalty of the members of the Morales Organization and the heads of other drug trafficking organizations, and their underlings, so that he could continue to ensure a reliable market for all the cocaine he was purchasing and to ensure the continued success of the Morales Organization by limiting potential competition; (c) ensure the continuing success of the Morales Organization, including during the periods 1997 to 2000 and after March 2003 when Ray Morales himself was in prison . . . ; and (d) ensure that Ray Morales could call on others to undertake tasks that Ray Morales considered necessary to ensure the survival and continued success of his organization, including the murders of competitors, customers who failed to pay their drug debts, and others.
>
> . . .
>
> Testimony at trial revealed that Ray Morales used violence, including the murders of other people, to deal with his competition, customers who owed him money, and others . . . on September 8, 2001, a person shot and killed Jorge Morales, a worker at the Morales Organization's drug market at Atlantic and Norris Streets. Because Ray Morales believed that violence at an open air drug market was bad for business, he decided to have the killer of Jorge Morales killed and Ray Morales took steps to determine the identity of that killer. After another person identified Kenneth Fussell as the killer of Jorge Morales, Ray Morales hired Jevon Lewis (and paid Lewis $10,000) to kill Kenneth Fussell. Jevon Lewis in turn hired Ahmed Judge and Jamar Bacon (now deceased), two members of the Jevon Lewis Organization, to murder Kenneth Fussell. Ahmed Judge and Jamar Bacon then murdered Kenneth Fussell on October 4, 2001.

> [] With regard to the murder itself, Kenneth Fussell was killed at approximately 11:30 p.m. on October 4, 2001. Fussell was shot on the steps of his apartment, located at 813 Chelton Terrace, Camden, New Jersey, as he was returning to the apartment with a bag of food for his family. Fussell was shot four times as follows: one bullet passed through his right arm; another bullet grazed his shoulder; another bullet passed through the right side of his face; and one bullet entered the back right side of his head and remained lodged in his forehead. The last bullet killed Fussell instantly.

(Id. at ¶¶ 53, 61, & 62).

Using the United States Sentencing Guidelines effective November 1, 2008, the United States Probation Office ("Probation") calculated Defendant's base offense level. Probation first noted that based on the total weight of crack cocaine involved Defendant's base offense level would be 38. (ECF 484 at ¶ 71). As to drug weight, the PSR did not find a finite amount either for powder cocaine or cocaine base determining instead without objection that Defendant along with his co-conspirators trafficked in "hundreds, if not thousands of kilograms of cocaine, as well as multiple kilograms of crack cocaine." (Id. at ¶¶ 70, 132).

However, Probation ultimately calculated Defendant's base offense level as a level 43 based on grouping Counts One and Two "pursuant to U.S.S.G. § 3D1.2(c) because the murder charge is a cross-reference to the drug conspiracy charge." United States Sentencing Guidelines ("U.S.S.G.") § 2D1.2(c) (November 1,

2008). (ECF 484 at ¶ 73). Accordingly, it was Defendant's murder conviction, not the weight of the drugs, that determined his base offense level.

After other adjustments, Defendant's criminal history category was found to be Category IV and his adjusted offense level a level 49. On top of the resulting advisory guideline range of life imprisonment for Courts One and Two, Defendant faced a minimum of an additional 120 months on Count Three to be served consecutively to Counts One and Two. (Id. at ¶¶ 105-109, 123, 154). Consistent with Probation's calculations, on May 15, 2009, a Judge of this Court sentenced Defendant to two terms of life imprisonment on Counts One and Two respectively, to be served concurrently, plus a term of 120 months on Count Three, to be served consecutively. (ECF 317). On July 23, 2009, the Court issued an Amended Judgment, updating the amount of restitution. (ECF 333). Defendant appealed his sentence, and the Third Circuit affirmed. (ECF 370).

On August 3, 2010, the Fair Sentencing Act (the "FSA") was enacted to reduce the disparity between statutory penalties for trafficking crack cocaine and powder cocaine. Pub. L. No. 111-220, 124 Stat 2372 (2010). The FSA also raised the drug quantities required to trigger certain minimum penalties pursuant to 21 U.S.C. § 841, one of the statutes under which Defendant was convicted. See United States v. Ferrer, 859 F.

App'x 648, 649 (3d Cir. 2021) ("The Fair Sentencing Act raised the drug-quantity thresholds needed to trigger certain mandatory-minimum sentences.").

In addition to the statutory changes to the Controlled Substances Act ("CSA") the FSA also had a cascading effect on the Drug Quantity Table found in the sentencing guideline section applicable to CSA offenses, U.S.S.G. § 2D1.1(c). Because the ratio between crack and powder cocaine was reduced, it required a larger amount of crack cocaine to raise any given base offense level. For example, under the November 2011 Guidelines an amount of 8.4 kilograms of crack triggered the highest offense level of 38 whereas under the 2008 Guidelines only 4.5 kilograms of crack was required.

The FSA had no effect on the amount of powder cocaine required to trigger the various base offense levels. This is because in order to reduce the ratio between powder and crack the amount of crack to trigger statutory penalties increased while the amount of powder remained the same. The United States Sentencing Commission amended the Sentencing Guidelines to reflect the FSA in November 2011. After the FSA, as before, the highest base offense level of 38 applied when the drug weight of powder cocaine was 150 kilograms or more. Compare U.S.S.G. § 2D1.1(c)(1) (November 1, 2007) with U.S.S.G. § 2D1.1(c)(1) (November 1, 2011).

Then in 2014, the United States Sentencing Commission promulgated Amendment 782 which retroactively reduced by two levels the base offense levels assigned to many drug quantities set forth in the Drug Quantity Table of U.S.S.G. § 2D1.1(c). United States v. Thompson, 825 F.3d 198, 202 (3d Cir. 2016). One effect of this downward adjustment was to increase the amount of power cocaine that triggered the highest base offense level of 38 in the following way. Since the quantities for a level 38 after Amendment 782 would be a level 36 in light of the two level downward adjustment, level 36 - not the highest level – would require a range which the Sentencing Commission determined for power cocaine to be 150 to 450 kilograms. Accordingly, moving up the Drug Quantity Table, 450 kilograms became the minimum amount to trigger the highest level 38 with no upper limit required. Compare U.S.S.G. § 2D1.1(c)(1) and (2) (November 1, 2013) with U.S.S.G. § 2D1.1(c)(1) and (2) (November 1, 2014).

On December 21, 2018, Congress passed the First Step Act ("First Step Act") which, among other things, in its Section 404 made the provisions of the FSA fully retroactive. First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018); Concepcion v. United States, 597 U.S. 481, 488 (2022). Section 404(a) sets out which offenses are covered by the FSA:

> (a) DEFINITION OF COVERED OFFENSE.—In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010.

First Step Act, § 404(a).

Subject to limitations set forth in Section 404(c) of the First Step Act, Section 404(b) states:

> (b) DEFENDANTS PREVIOUSLY SENTENCED.—A court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) were in effect at the time the covered offense was committed.

First Step Act, § 404(b).

Defendant filed the instant motion seeking a reduction in sentence based on § 404(b) on June 6, 2019. (ECF 406). After he was appointed counsel, Defendant filed a supplemental motion on August 26, 2019. (ECF 412). The Government filed its Response on November 4, 2019 (ECF 417) and Defendant filed a Reply on December 9, 2019 (ECF 422). The parties also filed several additional briefs and letters updating their positions between 2020 and 2022. (ECF 429, 433, 435, 438, 441, 442, 445, 447, 450).

Thereafter, due to the Government's abandonment of an appeal in a different matter that addressed issues salient to the instant motion, the Court ordered the parties to submit further briefing clarifying their positions. (ECF 466). The Government filed its further submission on June 30, 2022, conceding a previously disputed point that Defendant is eligible for consideration of a sentencing modification under § 404(b). (ECF 472). Noting this concession, this Court ordered Probation to prepare an addendum to Defendant's pre-sentence report, and permitted the parties to submit further briefing in response to the addendum. (ECF 474). On September 22, 2022, Probation filed its Final Presentence Investigation Report with Second Addendum. (ECF 484). Defendant filed its supplemental briefing on October 2, 2022 (ECF 488) and the Government filed a response on July 10, 2023 (ECF 504). Finally, on November 21, 2023, the Government filed another letter, advising this Court of additional precedent. (ECF 511).

On June 27, 2022, the Supreme Court issued an opinion in Concepcion v. United States, 567 U.S. 481 (2022), in which the Court held that a court resentencing a defendant pursuant to retroactive application of the FSA should first calculate the Guidelines with the only difference "to reflect the retroactive application of the Fair Sentencing Act." Id. at 498 n.6. The Supreme Court further directed that once a sentencing court

recalculates the Guidelines, it may "then consider postsentencing conduct or nonretroactive changes in selecting or rejecting an appropriate sentence, with the properly calculated Guidelines range as the benchmark." Id. Accordingly, in the Second Addendum Probation calculated Defendant's guidelines range given the retroactive application of the FSA. The guidelines range was unchanged, with Defendant having a criminal history score of Category VI, a base offense level of 43, and an adjusted offense level of 49. (ECF 484 at ¶¶ 97, 98). Probation stated that "the original guideline calculation remains intact" in light of the grouping and cross-reference rules that were unchanged as a result of the statutory changes set out above. (ECF 484 at 44-45)(Second Addendum)). Whatever the advisory guidelines may have been for the drug conspiracy count, Lewis had also been convicted of murder and it was that count of conviction that determined his guideline range whether one used the 2008 Guidelines or the 2023 Guidelines. (Id.).

## II. Legal Standard

A court that has sentenced a defendant for a "covered offense" prior to the enactment of the FSA may resentence a Defendant in accordance with the FSA's penalty changes by virtue of § 404(b) of the First Step Act. See United States v. Easter, 975 F.3d 318, 323 (3d Cir. 2020) (abrogated on other grounds by Concepcion, 597 U.S. at 490 n.2) (discussing motions made under

§ 404(b)). If the Court determines that a defendant is eligible for relief under § 404(b) of the First Step Act (and not excluded under § 404(c)), the Court must then also analyze such a motion under the sentencing factors set forth in 18 U.S.C. § 3553(a). Id. at 326 ("Accordingly, we hold that when deciding whether to exercise its discretion under § 404(b) of the First Step Act to reduce a defendant's sentence, including the term of supervised release, the district court must consider all of the § 3553(a) factors to the extent they are applicable.").

A court may only consider changes in facts that go to the § 3553(a) factors that were not in play at the time of original sentencing. United States v. Murphy, 998 F.3d 549, 555 (3d Cir. 2021), as amended (Aug. 4, 2021) (abrogated on other grounds by Concepcion, 597 U.S. at 490 n.2) ("This new assessment must include any new, relevant facts that did not exist, or could not reasonably have been known by the parties, at the time of the first sentencing (e.g., a defendant's post-sentencing rehabilitation or new health problems)."). This is because, a § 404 motion is not a license for a district court to reassess its original sentencing determinations. Id. ("[T]he resentencing court cannot reach beyond [facts that could not have been known at the original sentencing or post-sentencing developments] to reconsider the facts as they stood at the initial sentencing.").

In going about this analysis using the above standard, a sentencing court has a wide range of discretion to consider post-sentencing circumstances and "[t]he only limitations on a court's discretion to consider any relevant materials . . . in modifying that sentence are those set forth by Congress in a statute or by the Constitution." Concepcion, 597 U.S. at 494. In the case of the First Step Act, no additional limitations are in play. Id. at 497 ("Section 404(b) does not erect any additional such limitations. The term 'as if' simply enacts the First Step Act's central goal: to make retroactive the changes in the Fair Sentencing Act."). By the same token, a district court also is not required to modify a sentence even if it is empowered to do so under the First Step Act. Id. at 496 ("In fact, § 404(c) only underscores that a district court is not required to modify a sentence for any reason.").

In sum, for those who qualify for consideration of a reduction under § 404(b) the process for determining whether a defendant should receive a sentence reduction under the First Step Act contains two steps. United States v. Shields, 48 F.4th 183, 192 (3d Cir. 2022). First, "the District Court should start with the benchmark Guidelines range recalculated only to the extent it adjusts for the Fair Sentencing Act." Id. Then, the sentencing court may consider other post-sentencing developments that warrant consideration. Id.; Concepcion, 597

U.S. at 481 n.6. ("The district court may then consider postsentencing conduct or nonretroactive changes in selecting or rejecting an appropriate sentence, with the properly calculated Guidelines range as the benchmark.").

## III. Analysis

Although initially disputed, the parties agree that Defendant's conviction for a multi-object drug conspiracy offense involving both crack and powder cocaine is a "covered offense" for purposes of § 404(b) and he is thus eligible for consideration for relief. (ECF 472 at 2). However, the Government maintains that Defendant is ineligible for a sentencing reduction because in addition to the Count One drug trafficking conspiracy, he was also convicted of murder in violation of 21 U.S.C. § 848(e)(1) (Count 2) and 18 U.S.C. §§ 924(c)(1) and 924(j) (Count 3), neither of which are covered offenses.[1] In the alternative, the Government asserts that even if this Court determines that Defendant is eligible for a

[1] The issue of whether 21 U.S.C. § 848(e)(1) is a covered offense was disputed, with Defendant arguing that it was a covered offense. However, as discussed below, the Third Circuit has held that it is not a covered offense. United States v. Junius, 86 F.4th 1027, 1031 (3rd Cir. 2023).

reduced sentence, in exercising its discretion this Court should not grant a sentencing reduction. (ECF 472 at 3).

Defendant argues that he is eligible for a reduced sentencing where he was convicted of both covered and non-covered offenses. (ECF 488 at 1). Defendant explains that the sentencing package doctrine applies here, which "permits district courts to recalculate the aggregate sentence even when some of the offenses are not covered offences." (Id.). He therefore urges the Court to exercise its discretion and reduce his entire sentence to 30 years imprisonment, noting that "[i]f this Court were to reduce his sentence, the lowest possible sentence it could impose would be 30 years. Mr. Lewis remains subject to a mandatory minimum term of 20 years imprisonment on Count 2, murder in furtherance of a drug trafficking conspiracy, plus a consecutive 10 year sentence based on Count 3, murder in the course of a firearms offense." (Id. at 2-3). In a letter advising this Court of a recent Third Circuit decision, the Government argued that this Court should follow the reasoning of United States v. Junius, 86 F.4th 1027 (3rd Cir. 2023), where the Third Circuit rejected application of the sentencing package doctrine. (ECF 511).

This Court will begin with Defendant's argument that the sentencing package doctrine applies to allow this Court to reduce the overall sentence, including for convictions that are

not covered. As stated above, it is undisputed that Defendant was convicted of at least one "covered offense." However, he was also convicted of two offenses that are not covered. The circumstances in Junis are nearly identical to the issue here and as such bind this Court on this point.

In Junis, the defendants plead guilty to both covered and not covered offenses. Defendant Coach "pled guilty to possession with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and intentional killing in furtherance of a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848(e)(1)(A), along with other counts." Junius, 86 F.4th at 1029. These are the same violations at issue here. Defendant Coach was sentenced to concurrent sentences of 60 years on each charge. Id. The Third Circuit explained that while the FSA "expressly modified penalties associated with convictions under only 21 U.S.C. §§ 841(b)(1)(A)(iii), 841(b)(1)(B)(iii), 960(b)(1)(C), and 960(b)(2)(C)" it "did *not* modify the statutory penalty for a § 848(e)(1)(A) violation, which remained punishable by a mandatory minimum term of imprisonment of 20 years and a maximum term of life imprisonment or a sentence of death." Id. at 1031 (emphasis in original). The Court expanded that even though a conviction under § 848(e)(1)(A) "rests on a § 841(b)(1)(A)

violation," offenses under § 848(e)(1)(A) are not covered under the First Step Act. Id.

The Court also explained that the sentencing package doctrine[2] is inapplicable. Id. The Third Circuit in Junis explained that the "Court recently recognized that [w]hether two sentences are interdependent turns on whether they result in an aggregate sentence as opposed to sentences which may be treated discretely." Id. at 1028 n.1 (quoting United States v. Norwood, 49 F.4th 189, 203 (3d Cir. 2022)) (internal quotations omitted) (alteration in original). It thus follows that the sentencing package doctrine does not usually apply to sentences grouped together under the Sentencing Guidelines or to concurrent sentences." Id.

Applying this to the circumstances in Junis, the Third Circuit explained that the sentences imposed "for murder in furtherance of a continuing criminal enterprise were imposed independently from their cocaine base distribution charges. So

[2] "The sentencing package doctrine suggests that when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan. When a conviction on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand, within the applicable constitutional and statutory limits, if that appears necessary in order to ensure that the punishment still fits both crime and criminal." United States v. Davis, 112 F.3d 118, 122 (3d Cir. 1997).

they were not part of a sentencing package." Id. In addition, the sentences imposed were to run concurrently, further demonstrating that the sentences "could be treated discretely" and therefore "the sentencing package doctrine does not apply." Id. The Third Circuit concluded that "[a]s murder in furtherance of a CCE is not a 'covered offense' under the First Step Act, and since the sentencing package doctrine is inapplicable to the facts of this case, the District Court was correct to conclude that [Defendants] were each ineligible for sentence reductions." Id. at 1031.

Like Defendant Coach in Junis, Lewis was convicted under § 841(b)(1)(A) and § 848(e)(1)(A). While his § 848(e)(1)(A) conviction necessarily relies on his § 841(b)(1)(A) conviction, the sentencing Judge, Judge Irenas, imposed separate sentences, imposing a life sentence for each to run concurrently. Therefore, Lewis, like the defendants in Junis, is ineligible for a sentence reduction on his overall sentence as his life sentence under Count Two, and his consecutive 120 month sentence under Count Three may not be reviewed under the First Step Act.

This Court, Junis notwithstanding, may, within its discretion, reduce the specific sentence imposed on Count One, the § 841(b)(1)(A), although it will have no effect on his life sentence under § 848(e)(1)(A). Junis, 86 F.4th at 1029, n. 3 (district court acted within its discretion to consider reducing

defendant's drug offense sentence). The Court will therefore assess the § 3553(a) factors to determine whether to impose a reduced sentence solely on the conviction under § 841(b)(1)(A).

Before proceeding to analysis of the § 3553(a) factors, this Court will address Defendant's request for a resentencing hearing. While the Court may, in its discretion, hold a hearing, it is not obligated to do so in assessing whether to a reduce a sentence pursuant to § 404(b). Shields, 48 F.4th at 194 ("neither the original sentencing judge nor a judge to whom the case has been reassigned is required to hold an in-person resentencing hearing on a First Step Act motion"). Based on the fulsome record, this Court, in its discretion, will rule solely on the parties' submissions.

While the Court must consider "any new, relevant facts that did not exist . . . at the time of the first sentencing," this Court is not free to reweigh the factors in play at the time of the original sentencing. Murphy, 998 F.3d at 555. Accordingly, except to the extent they serve as contrast, in assessing the § 3553(a) factors this Court will consider the post-sentencing facts set forth by the parties in their briefing as compared to the facts found by Judge Irenas at the original sentencing. Stated differently, this Court will not reassess the facts considered by Judge Irenas in his original sentence.

The nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), are unchanged. In describing the nature and circumstances of the drug conspiracy offense, Judge Irenas stated, "we're talking a drug conspiracy here, very major proportions, major, major. . . . you just can't get much more serious than that." (ECF 342 at 86:6-10). Judge Irenas noted that this drug conspiracy "brings within its wake, murder, violence, and untold unhappiness to the users." (Id. at 86:18-21). He explained that specifically, this drug conspiracy involved premeditated murder, "about as serious a crime in the panoply of crimes that you can get." (Id. at 86:24-25). He described all three counts as "heinous crimes." (Id. at 87:4-5).

The history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), require the most significant update. Judge Irenas' assessment of this factor at the original sentencing was not promising. While Judge Irenas explained that he believed Defendant's colloquy at sentencing that he was contrite, (id. at 96:6-10) ("I don't disbelieve what he said when he talked to me. I mean when he gets up and he believes he's sorry, I believe he means it."), he also noted the limitation that he could only go by past behavior, and any prediction of the future would be speculative. (Id. at 95:21-25). The only other significant information Judge Irenas had regarding Defendant's character was

"the taking of two lives" and his history as a drug dealer. (Id. at 96:11-15). To provide more detail, the two lives Judge Irenas referred to include the murder that is part of Defendant's instant conviction, as well as a previous conviction for manslaughter.

The bulk of the new information for this Court's consideration relate to Defendant's character since his original sentencing. Defendant has presented multiple notes from prison staff attesting to his good character. One note details his involvement in the Suicide Watch Companion Program at United States Prison ("USP") Allenwood. (ECF 406 at 10). Another describes his completion of a program called the Challenge Program, "a 500 hour cognitive behavioral therapy program aimed at changing criminal thinking." (Id. at 11). A letter from the Staff Chaplain at USP Allenwood shares that he regularly attends services and "demonstrate[s] his strong commitment to the practice of his faith." (Id. at 12). Multiple memoranda, one from 2019 and another from 2021, from his supervisor for his work while incarcerated explain that he is "a dependable, reliable hard worker." (Id. at 13; ECF 447-1 at 1). Defendant also participates in the Mental Health Companion Program as a Peer Mentor at USP Allenwood. (ECF 422-1 at 2). Defendant presents a letter from his daughter and two from himself. (ECF 406 at 18-20; ECF 447-2 at 1).

Defendant also presents his BOP SENTRY Report, not all of it good. (ECF 450-1). The report includes multiple incidents, including two incidents of Defendant possessing a weapon, one in 2012 and one in 2014, and an incident of fighting in 2015. (ECF 450-1 at 2, 3, 5). However, Defendant points out that, as of the date of the October 27, 2021 report, he "maintained a clean disciplinary record for more than 6 years." (ECF 450 at 1). All in all, the court notes and appreciates the significant progress Defendant has made while incarcerated despite the severity of his crimes and the dark picture painted at his original sentencing.

In considering the need for the sentence imposed to reflect the seriousness of the offense, 18 U.S.C. § 3553(a)(2)(A), Judge Irenas stated that "[i]t's very clear that just about the most serious punishment that the law is capable of giving are called for here." (ECF 342 at 87:15-18). In examining the need for the sentence imposed to afford adequate deterrence, 18 U.S.C. § 3553(a)(2)(B), Judge Irenas noted the general deterrence of communicating to the public that "we don't tolerate massive drug dealing." (Id. at 93:2-6). He also pointed to specific deterrence, as Defendant had "no serious employment history," but instead had been supporting his family through drug dealing since he dropped out of school in 9th grade. (Id. at 93:7-13).

In contrast, while these facts remain true, the Court notes that Defendant has worked while incarcerated. Defendant avers that "[r]esearch studies consistently confirm that it is the certainty, rather than the severity of punishment that serves as a deterrent." (ECF 406 at 8). While this Court acknowledges that research, it also must acknowledge that at the time of the instant offense Defendant had a prior conviction for manslaughter for which he served seven years of a twenty-year sentence before he was paroled. (ECF 484 at ¶¶ 112-116). While on parole for the manslaughter conviction, Defendant was arrested, and subsequently convicted, for felon in possession of firearm in the Eastern District of Pennsylvania. (Id. at ¶ 116). While Defendant's progress during incarceration is commendable and suggests a somewhat lower risk of recidivism and therefore a lesser need for specific deterrence if the defendant were to receive a term of years for Count One, the need for the sentence to act as a deterrent to others (general deterrence) remains high and paramount despite Defendant's personal improvement.

Assessing the need for the sentence imposed to protect the public, 18 U.S.C. § 3553(a)(2)(C), Judge Irenas expressed a need to protect the public in this case. (ECF 342 at 93:15-18) ("Two takings of a life, there's been large scale drug dealing, so I think you need both to deter the public generally, but also to

protect the public from further crimes of the defendant.”). Defendant argues that the reduction sought “is modest in scope and not likely to increase the risk of recidivism or endanger the public.” (ECF 406 at 7-8). He also explains that “[r]esearchers at the National Institute of Justice have found that criminal behavior changes dramatically as a person ages” and he avers that this is true for him. (Id. at 8). As he has aged he has become less likely to commit a crime or recidivate. (Id.). This factor slightly favors a reduction on Count One.

Looking at the sentencing range, 18 U.S.C. § 3553(a)(4), this Court notes that the guideline has not changed, despite the changes in the drug laws and sentencing guidelines applicable to Title 21 offenses, because the guidelines regarding grouping multiple counts of conviction have not changed. Accordingly, Probation has reported that their calculation remains the same now as it was at the time of the original sentencing.[3] (ECF 484

[3] The Court notes that while Probation did not calculate the guidelines for Count One as a standalone offense either originally or in preparing the Second Addendum in light of the grouping rules, if Defendant had been convicted of only Count One and no other crimes, and the underlying facts remained the same, his adjusted offense level under Count One would still have been life, the First Step Act notwithstanding. The Court acknowledges that the PSR’s finding regarding drug weight that the Defendant trafficked in “hundreds, if not thousands of kilograms of cocaine, as well as multiple kilograms of crack cocaine”, (Id. at ¶¶ 70, 132), is ambiguous. On the one hand, it could be read to say that a conclusion could easily be reached by a preponderance that the Defendant trafficked far in excess of 450 kilograms of powder cocaine required for a level

at 45). In considering the guideline sentence at the time of the initial sentencing, Judge Irenas stated his position that "[t]here is nothing about this case that suggests that the crime is so much less serious than the guideline drafters anticipated." (ECF 342 at 94:10-12). That overall assessment remains as true today as it was then.

---

38 even after the FSA. On the other hand, 300 kilograms, for example, would still be "hundreds" of kilograms of cocaine warranting only a level 36 under existing law. Nonetheless, even taking a conservative view of the facts, given Probation's conclusion that Lewis trafficked in "well over 150 kilograms" of power cocaine, his base offense level for a standalone drug conspiracy would be at least a level 36 under the guidelines now in place, U.S.S.G. § 2D1.1(c)(2). (ECF 484 at ¶ 44). He would then have received points, then and now, for possession of a firearm, § 2D1.1(b)(1)(+2); use of violence § 2D1.1(b)(2)(+2); role in the offense, § 3B1.1(a)(+4) (Id. at ¶¶ 78)("Jevon Lewis was the leader and organizer of a separate long-term, large-scale drug trafficking organization in Camden"); and obstruction of justice for suborning perjury, § 3C1.1 (+2) for a total adjusted offense level of 46, still three levels above the highest offense level in the sentencing table. While it is true that the points for possession of a firearm and use of violence would fall away as double counting in light of the convictions on Counts Two and Three, Defendant's adjusted offense level for Count One if the grouping rules did not apply would be still be a level 42 and an advisory range of 360 months to life. To be clear, the Court recognizes that the Sentencing Guidelines, including the grouping rules, are advisory and that this Court has the authority to resentence the Defendant consistent with a level 42 and below, all the way down to the statutory floor on Count One and further that a sentence to a term of years is materially different than a sentence of life. This Court's analysis of the various calculations set forth is meant to show not that the Court lacks the authority under the First Step Act to lower Defendant's sentence on Count One, only that there is little in the record of this case given the severity and scope of Defendant's drug trafficking and related crimes to justify that result.

Overall, the § 3553(a) factors do not weigh in favor of a reduced sentence. This Court commends Defendant's involvement in prison programing, his more recent pro-social behaviors as reported by BOP staff, and his volunteer work as a peer mentor and suicide watch companion. He appears to be making a positive contribution in a challenging environment. That said, these positives at this time do not overcome the significant seriousness of Defendant's offense, his character leading up to his conviction, the need for both general and specific deterrence, and the need to protect the public, especially where this Court considers that his guideline range today, while not binding then or now, is the same as that considered by Judge Irenas at the original sentencing.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion for Reduction of Sentence (ECF 406) and Supplemental Motion for Reduction of Sentence (ECF 412) will be denied.

An accompanying Order will issue.

Date: February 9, 2024
At Camden, New Jersey

s/ Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.